UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-20402-cr-COOKE

UNITED STATES OF AMERICA,

    Plaintiff,

V.

JORGE RAMON HERNANDEZ,

    Defendants.

_____/

**DEFENDANT JORGE HERNANDEZ'S SENTENCING MEMORANDUM IN SUPPORT OF DEFENDANT'S REQUEST FOR A DOWNWARD DEPARTURE AND VARIANCE**

Defendant, JORGE HERNANDEZ, by and through undersigned counsel respectfully submits this Sentencing Memorandum in support of the Defendant's request for a downward departure from of the sentencing guidelines range pursuant to U.S.S.G. §§ 5H1.11 and 5H1.3. Alternatively, Defendant Hernandez requests a variance pursuant to the factors set forth in 18 U.S.C. § 3553(a), and in support thereof says as follows:

**Legal Grounds for a Departure or Variance.**

The factors set forth in 18 U.S.C. § 3553(a) specifically direct the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The statute also requires the Court to consider the need for the sentenced imposed to (1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct;

1

(3) the need to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). The statute further requires the Court to consider the kinds of sentences available and the kinds of sentencing and the sentencing range established by the Sentencing Guidelines. 18 U.S.C. § 3553(a)(3) and (4); Finally, the statute requires the Court to consider the need to avoid unwarranted sentencing disparities and the need to provide restitution to victims. 18 U.S.C. § 3553(a)(6) and (7). United States v. Cubero, 754 F. 3d 888, n. 2 (11th Cir. 2014).

Furthermore, Sentencing Guidelines §5H1.11 permits the Court to depart from the sentencing guidelines for a Defendant's military service where the service is present to an unusual degree and distinguishes the case from the typical case.  [1]See U.S. v. Hogge, 2101 U.S. Dist. LEXIS 142344 (N.D. Ind. 2010 March 29, 2010), (finding the defendant's distinguished military record relevant to departure and variance considerations under 18 U.S.C. § 3553(a) and USSG § 5H1.11.) *See also* Case Annotations and Resources, Military Service, USSG 5H1.11 Departures and Booker Variancesa, Prepared by the Office of General Counsel U.S. Sentencing Commision(January2012),

https://www.ussc.gov/sites/default/files/pdf/training/primers/2012_01_Military_Service_5H1-11_Departures_Booker_Variances.pdf

---

[1] USSG §5H1.11states as follows:

Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.

Additionally, Sentencing Guidelines § 5H1.3 provides for a departure where mental and emotional conditions may be relevant in determining whether a departure is warranted if such condition individually or in combination with other offender characteristics are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. [2] U.S. v. Holden, 61 F.3d 858, 861 (11th Cir. 1995) ("In order to grant a departure pursuant to this section, [U.S.S.G. §5K2.13] the district court must find that the defendant's diminished capacity contributed to his offense. (emphasis in original).

**Pre-military service Accomplishments.**

Mr. Hernandez graduated 3rd in his class at North Miami Senior High School, class of 1996. During his graduating year he received an Academic Excellence Certificate of Achievement and a Florida Academic Scholar Certificate of Recognition. He scored in the 99th percentile on his

---

[2] U.S.S.G. § 5H1.3 states in part:

Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. See also Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)

U.S.S.G. 5K2.13 Diminished Capacity (Policy Statement) states as follows:

A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

SAT score.  He was awarded a full scholarship to the University of Miami where he attended and completed 24 courses prior to joining the military.

**Military service - Overall**

Mr. Hernandez enlisted in the U.S. Army as a private on August 8, 2001, only a month before the September 11 terrorist attacks. He rose to the rank of Second Lieutenant during his eight-year military career that ended with an honorable discharge due to disability.  He learned the Arabic language as part of his military service despite having no prior knowledge of the language, and he became so skilled in Arabic he was assigned to interpret information for key military intelligence and served as a translator.  He served in dangerous combat zones in Iraq and Afghanistan where he was frequently exposed to life threatening combat and received numerous awards and decorations during his military career.

**Military service - Details**

Following the September 11 terrorist attacks, a dire need for Arabic speaking soldiers arose.  Mr. Hernandez's Army administered standardized test scores were so high that he was chosen to study Arabic and sent to the Defense Language Institute Foreign Language Center in the Presidio of Monterey, California where he underwent intensive studies of Arabic courses for 18 months.  He was one of only two students that graduated with honors, having become fully fluent in Arabic.  He then studied military intelligence and furthered his knowledge of Arabic dialects.  (Exhibit A, B, & C)  After extensive background investigations and polygraphs, he was awarded a top secret clearance and was assigned to the 513th Military Intelligence Brigade, which at the time was the most internationally deployed unit in the Army.  He received training in all types of subjects and matters, from Cellular Wave Propagation Theory to Iraqi Dialect, and was assigned to work for the

4

National Security Agency (NSA) at their Middle East/North Africa Regional Observation Center and granted NSA caveats to his clearance. For over a year while based in the U.S. he worked daily as the Senior Linguist, where he along with other members of his team did all the intelligence collection and support for the search, capture, or attacks on insurgents. His job was to verify the location and presence of High Value Targets, ordering direct assaults with special forces or air attacks with Hellfire Missiles.

Eventually he was removed from that mission and received extensive training ranging from desert survival and combat tactics, before he was flown to Kuwait City where he was attached to the Field Office South West Asia (FOSWA) which is a joint task force between other government agencies, such as the FBI, CIA, and DIA. He worked on several assignments with these three agencies and a host of other governmental agencies. Part of his assignment was to function as a liaison between U.S. troops and the Kuwaiti Ministry of Interior / Ministry of Defense for the turn-over of the U.S. Army base in Arijan, Kuwait as well as security routes into Iraq and to Baghdad.

In late 2004 he was deployed to Iraq in support of Operation Iraqi Freedom (OIF) where he was tasked as the Senior Linguist in an intelligence gathering mission as the translator on the ground for the Quick Reactionary Force in Southern Iraq. This group responded to attacks from insurgents and incidents involving troops. Serving for 18 months in the Iraqi conflict meant he faced danger of being killed or injured almost daily. As a linguist his tasks varied from translating for government officials to assisting in interrogations. He was promoted to sergeant on May 1, 2005 while serving in Iraq. (Exhibit E)

On September 13, 2005, he formally re-enlisted in the Army for an additional six-year tour. At the end of his deployment he was mentally exhausted and had already sustained injury to his

leg and right arm when a disabled Humvee collapsed off its jack in the desert pinning his arm between the wheel-well and its massive tire, requiring surgery. He returned to Ft. Gordon, Georgia, from Iraq where he continued working for Army Military Intelligence as a Senior Crypto-linguist.

The commanding General of Mr. Hernandez's post recommended Mr. Hernandez for officer candidate school (OCS), pointing out that " He is the perfect choice to be a future officer in the Army... Sgt. Hernandez's exceptional performance and technical expertise set him apart from his peers." (Exhibit N)  Before Mr. Hernandez departed for OCS he learned there was a serious need for Arabic linguists in Afghanistan after multitudes of hostile combatant fighters that entered Afghanistan were being engaged and captured, so Mr. Hernandez deferred his admission to OCS and was re-deployed for a year-long deployment in support of Operation Enduring Freedom.

His experiences in Afghanistan were equally unique.  He was attached to a combined military intelligence mission made up of U.S. military, Nato, and international security forces. He served as an Arab translator after receiving training in Advanced Arabic Transcription and Advanced Arabic Translation. (Exhibits F & G) At one point he understood that he was the only Arabic linguist in Afghanistan.  His assignments were not desk jobs.  His work included intercepting enemy terrorist activity through electronic surveillance while riding on Humvee vehicles through hostile areas.  As an infantry soldier he often accompanied other infantry troops on combat missions facing danger of being killed or injured.  He was summarily exposed to artillery shelling, enemy bullets, rocket attacks, and even received a serious back injury/spinal fracture while on a mission into heavily attached region of Qalat in the South.  His injuries required him to be redeployed back to the states.

On May 26, 2006, while serving in Afghanistan, Defendant Hernandez was awarded the prestigious "Joint Service Achievement Medal," by the Secretary of Defense for Meritorious Service in Afghanistan. (Exhibit H) The Army explained his valuable contributions that led to this award in his military records:

> Sergeant Jorge Hernandez served as a night shift supervisor, cut manager and a Transcription Manager for the Remote Operations Cryptologic Center (ROCC), Combined Joint Task Force (CJF-76) at Bagram Airfield, Afghanistan from 9 January 2006 to 15 July 2006. He distinguished himself by performing his duties and responsibilities in an exemplary manner, rapidly becoming a subject matter expert on these first and totally unique collection sites.
>
> Sergeant Hernandez was directly responsible for gathering, analyzing, and the fusing of hundreds of thousands of SIGINT traffic from three remote collection facilities that included Jalalabad, Qalat and Salerno in preparation for direct action against known and suspected Anti-Coalition Militant terrorist and their areas of Operation Enduring Freedom VI. His professional work ethic enabled his section to quadruple intelligence reporting compared to other CJTF-76 SIGINT reporting and analysis shops. Sergeant Hernandez's ability to transmit intelligence in concise language was invaluable. He contributed to accurately transcribing over 200,000 cuts of intelligence data for processing and analysis reporting.
>
> Sergeant Hernandez's contributions helped the fusion of intelligence from disparate sources to warn the warfighter on the ground of impending threats within their area of operation. His exceptional analysis was crucial to the successful execution of operations that killed or captured Anti-Coalition Militant terrorist leaders, facilitators and fighters, and the disruption of the activities of their cells. He played a crucial role in assisting in the development of ROCC standard operating procedures and continuity books. His attention to detail, grasp of dynamically changing situations, and decision making abilities exemplifies the professionalism of the United States Army Central Command.

(Exhibit H.)

Defendant Hernandez also earned these distinguished awards:

1. Army Good Conduct Medal – awarded following three years without any type of disciplinary action. (Exhibit I)
2. National Defense Service Medal. (Exhibit J)
3. Afghanistan Campaign Medal. (Exhibit J)
4. Global War on Terrorism Expeditionary Medal. (Exhibit J)
5. Global War on Terrorism Service Medal. (Exhibit J)
6. Army Service Ribbon. (Exhibit J)

      7.  Certificate of Achievement Medal. (Exhibit K)

In Afghanistan Mr. Hernandez suffered a back injury from a fall while disembarking from a helicopter.  It caused a fracture to his L5 and L6 that resulted in constant pain.  Though he tried to hide the pain hoping it would not interfere with his activities in the Army, it became too difficult and led to his medical discharge in 2008. Despite his injuries, Mr. Hernandez attended OCS and received his commission into the infantry branch.  On April 12, 2007 Mr. Hernandez was promoted by the Army to the rank of a Second Lieutenant in the infantry. (Exhibit L)

The condition of his back eventually worsened and reached a point where a medical evaluation deemed him too incapacitated to continue in the service and was medically discharged. Mr. Hernandez had hoped to make a career in the Army and eventually join the Special Forces.  His discharge was a difficult to accept.  He tried to rehabilitate enough to re-enlist after his discharge.  In fact, Physician Assistant Jeffrey Cohen, prepared a letter in support of his attempt to reenlist stating that Mr. Hernandez was "highly motivated to return to the U. S. Army." (Exhibit M) But his efforts to re-enter the Army were rejected due to his injury.

Attached is a letter from Carlos Martinez who served with Mr. Hernandez in the Army. (Exhibit O) Mr. Martinez provides a detailed account of his experience serving with Defendant Hernandez.   Also attached are photographs showing Defendant Hernandez during his military service.

**Post-Military Service Adjustment and Mental Condition.**

After his discharge in 2008 and after his rejected attempt to reenlist due to his medical condition, adjustment into civilian life went poorly.  Mr. Hernandez applied for local law enforcement jobs but when he applied for veterans hiring preference and his disability and injuries came to light, he became disqualified from those positions.  The economy was then

undergoing the Economic Crisis of 2008, placing the country in a severe recession. Without any real practical or vocational skills Mr. Hernandez found it difficult to find work. He decided to further his education and returned to the University of Miami for the fall 2008 and spring 2009 semesters to complete undergraduate courses with plans to apply to the University of Miami Law School to obtain a JD degree.

Meanwhile, he suffered from Post-Traumatic Stress Disorder (PTSD) and injury pain, causing him to fall into a state of depression. Mr. Hernandez's military experience from serving in combat during two tours of duty left him damaged mentally, emotionally, and physically. The only place he could turn for help was the VA facility.

The VA did diagnose him with PTSD, sever depression and an anxiety disorder. He was prescribed medications for depression, anti-anxiety medication, anti-psychotic medication, sleeping pills, and muscle relaxers with opiates for his physical injuries. The VA had granted him only 10% disability with a $105 a month payment. He was unable to pay child support, car payments, credit cards, rent, let alone cope with an environment not conducive to the reintegration of recent veterans. The VA's treatment plan was to prescribe more pain medication, but he received inadequate treatment for PTSD, and they underrated his physically disability. He struggled financially, physically, and mentally.

As a result, he dropped out of school, withdrew from his family and friends, and eventually found himself homeless, without a car and with no support. He was unable to obtain work that would pay enough for him to support his daughter and his grandmother and to pay his own bills.[3] There were just no opportunities at a time when businesses were laying off and not

---

[3] Mr. Hernandez arrived from Cuba during the Mariel Boatlift at the age of two. His father appears to have abandoned his family and his mother lived in a different city. His grandmother, now 80 years old, raised him until his adult years. Because of his devotion to his grandmother he wanted to support her.

hiring.  While in school he had to stay at a friend's place in Hialeah where he paid for rent but exhausted his savings.

He became interested in personal fitness and moved to Georgia in 2010 for six months. There he found work for a company that ran gyms, but the company failed to pay him on a regular basis, and he returned to South Florida.  He obtained a pilot's license with the idea of a career as a pilot, but he found his anxiety made it difficult to continue flying.  He moved into an apartment in downtown Miami but fell behind in rent for 3 to 4 months and was forced out of the apartment.  He had an automobile that was repossessed and at one point was using a bicycle for transportation.

Every time he returned to the VA begging for help, he was attended by a different intern who gave him the same basic questionnaire and was given a different litany of pills and prescriptions.  He needed an increased disability percent to account for his mental and physical injuries, but he found himself completely incapable of navigating through the VA bureaucracy with applications and appointments to receive his due assistant.  His life soon fell apart.

For the first time in his life he also began taking and abusing illegal drugs, specifically MDMA or "Mollies", for pain relief both mentally and physically.  This led him to the world of dealing drugs out of desperation and the need for money.  In 2011 he began associating with the wrong people whose lifestyle and earnings were steeped in the world of exotic drugs and became involved in a conspiracy that obtained these drugs from Chinese suppliers who sold them over the internet and shipped them to the United States.  He was eventually arrested on a Complaint and began cooperating with law enforcement from the beginning in the prosecution of 11 other individuals.

His cooperation required him to testify at the trial of a codefendant in the conspiracy. The events that led to the instant case are an extension of occurrences from his first case. In his testimony, Mr. Hernandez testified about a third person, an associate of the codefendant. The associate let Mr. Hernandez know he was angry about certain things which Mr. Hernandez had said. Additional information is provided in the PSI, ¶ 14. This led to Mr. Hernandez committing the instant offense during the time he was in a half-way house and prior to his supervised release period.

Until recently Mr. Hernandez's PTSD issues have never been adequately treated. After Mr. Hernendez was released from custody, he resumed visits to the VA where his PTSD been fully recognized, and more substantial treatments began. Also significant, the VA finally diagnosed that he suffered from bipolar disorder, an underlying cause to his anxiety and depression. The Defendant believes that this psychological issue may have contributed to his decision to comply with the pressures placed on him by the associate to order the Ephylone from China.

After a battery of medications were prescribed by the VA over the past year, his doctors seem to have found a combination that works to help Mr. Hernandez. While he was on supervised release, he actually showed improvement. He has been drug free during his probation period, and the medication recently prescribed has been helping. He was able to gain employment as a production assistant for several television production companies where worked since May of 2019 through his arrest in June of 2019. Mr. Hernandez's probation officer who supervised him during his supervised release period informed Mr. Hernandez's counsel that Mr. Hernandez was very cooperative during his period of supervision and that Mr. Hernandez demonstrated professionalism and a drive to improve his employment. There was stability in his

personal life. He quickly developed a good rapport with his Probation Officer and there were no problems. In fact, it appeared to his probation officer that Mr. Hernandez was on course to turn his life around.

**Other criminal conduct section of the PSI.**

Paragraphs 33 through 37 provide narratives of from prior arrest reports though none of them resulted in convictions. The Defendant offers an explanation for these charges.

¶ 33 - The check at issue was a good check all along.

¶34 - When Mr. Hernandez was in the military stationed in Georgia, he had a U.S.A.A insurance policy. Unbeknownst to Mr. Hernandez the insurance company reported the policy to Georgia but failed to report his policy to the Florida DMV. Because Florida DMV had no record of his insurance, it suspended his license. He had kept his Florida license while stationed in Georgia because the Military does not require that he change his license to the state of residence.

¶35 - This involved a check for $600 that a girlfriend had given him. Months later after they broke up, she decided she wanted the money back and she called the bank and accused Mr. Hernandez of forgery. When she found out he that what she had done led to his arrest, she abandoned the complaint and did not cooperate in the investigation.

¶36 - This complaint was by an ex-girlfriend. When the "victim" initially came to Mr. Hernandez's residence she was hostile to the him and the police threatened to arrest her if she did not leave. Subsequently she filed a false report about the incident. When it was discovered that the false report contradicted the first report, the matter was dismissed by a nolle prosse.

¶37 - Mr. Hernandez denied the allegation that he battered the alleged victim.

**Conclusion**

The Defendant requests that this Court also consider a downward departure in the Defendant's sentencing guidelines range based upon his section 5H1.11 based upon his distinguished military record serving his country during a time of need that distinguishes his case from the typical one.

Additionally, the Defendant requests the Court to consider a downward departure pursuant to U.S.S.G. § 5H1.3 based upon his mental and emotional condition resulting from PTSD that is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.

In addition to the grounds for departure under §§ 5H1.3 and 5H1.11, the Defendant requests that the Court consider a variance under the factors of 18 U.S.C. § 3553.

Respectfully submitted,

**KENNY SWARTZ**
SWARTZ LAW FIRM
One Flagler Building
14 N. E. 1st Avenue, Suite 1211
Miami, FL 33132
Tel: 305-579-9090
Fax: 305-579-9090
Florida Bar No. 331929
ken@swartzlawyer.com


/S/__Kenny Swartz_____
        Kenny Swartz

**CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on January 20, 2020 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and simultaneously served the foregoing document on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

                /s/ Kenny Swartz
                Kenny Swartz